IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 16-cv-02154-RBJ

MIONIX, LLC, a Nevada limited liability company,

    Plaintiff,

v.

ACS TECHNOLOGY (aka) Mionix CO.,
WALTER LARRY L'HOTTA, an individual,

    Defendants.

## ORDER

This matter is before the Court on Plaintiff Mionix, LLC's ("Mionix") motion for summary judgment as to its affirmative claims, ECF No. 63, and its motion for summary judgment regarding the counterclaims asserted against it by defendants ACS Technology and Walter Larry L'Hotta. ECF No. 70. After reviewing the briefing and relevant law, the Court DENIES both motions.

## BACKGROUND

Mionix is a biotechnology firm that invents and sells chemical technologies to a wide array of industries, including the agribusiness and food safety industries. ECF No. 39 at 2. Larry L'Hotta worked as a sales manager for Mionix from approximately 2005–2007. *Id.* at 4. In January 2007 Mionix informed its employees that it was closing down operations and would be laying off its workforce. ECF No. 55 at 14. In an effort to help Mionix stay in business or

alternatively sell its assets, Mr. L'Hotta stayed on with Mionix for an additional six months. *Id.* By the time Mr. L'Hotta's employment ended in 2007, Mionix owed him $3,500 in back pay that Mionix claimed that it lacked funds to pay. *Id.* at 15. Mr. L'Hotta proposed that in lieu of Mionix paying him the $3,500, Mionix could instead treat the $3,500 as Mr. L'Hotta's payment to obtain a licensing agreement whereby he would independently continue his sales and marketing efforts of Mionix products. *Id.* Under the terms of this two-year agreement, Mr. L'Hotta had the right to market, manufacture, and sell Mionix's various chemical products; was to pay Mionix a percentage of his sales; and could only solicit clients with whom Mionix did not have a prior business relationship. *Id.*; ECF No. 79 at 1–2. To effectuate this agreement, Mr. L'Hotta formed a company called ACS Technology. *Id.* ACS Technology and Mionix formalized the licensing agreement in October 2007. ECF No. 55 at 15.

During the two years covered by this licensing agreement, Mionix entered into another licensing agreement with a company called Ivesco to sell Mionix's product FreshFlo 100. *Id.* at 16. Around this same time, Mionix requested that ACS Technology voluntarily cease its sale of FreshFlo 100. *Id.* ACS Technology rejected this request but countered with a proposal that Mionix buy out ACS Technology's license, which Mionix allegedly ignored. *Id.* Then, ACS Technology was informed by its FreshFlo 100 supplier, Hydrite, that Mionix had purchased all remaining inventory of FreshFlo 100, leaving no FreshFlo 100 product for ACS Technology to sell to its customers. *Id.* at 17. Later, Mionix switched suppliers of FreshFlo 100 and provided the product to Ivesco but not to ACS Technology. *Id.* When ACS Technology demanded that Mionix allow it to purchase some of the FreshFlo 100 made by this new supplier, Mionix quoted

2

ACS Technology a price approximately twice market price, which effectively prevented ACS Technology from obtaining any FreshFlo 100. *Id.*

Because ACS Technology was unable to consistently obtain FreshFlo 100 to sell, Mr. L'Hotta approached Hydrite—the original supplier of FreshFlo 100—about developing a new process to make a product similar to FreshFlo 100. *Id.* The products would be similar in that they would both be made using acidified calcium sulfate ("ACS") and would both be sold for use in animal drinking water. *Id.* Hydrite agreed, and in 2008 ACS Technology began selling its new ACS product. *Id.* Initially ACS Technology sold the new product under the FreshFlo 100 brand that it had licensed from Mionix. *Id.* However, in April 2009, months before the licensing agreement ended, ACS Technology began selling the product under a new name, LpH 100. *Id.* at 17–18.

After the two-year licensing agreement between Mionix and ACS Technology ended in October 2009, ACS Technology continued to market and sell its LpH 100 product. *Id.* at 18. Defendants admit that at certain times since October 2009 they have "inadvertently and erroneously" referred to Mionix's products in their communications or invoices. *Id.* Mionix asserts that this wrongful use of Mionix intellectual property occurred on the ACS Technology website and in its business documents where ACS Technology featured Mionix research studies, patent information, and an industry standards identification code without attributing this information to Mionix. Mionix asserts that this was done to give the appearance that ACS Technology was in some way still associated with Mionix. ECF No. 39 at 10–14.

In 2013 Mionix's attorney sent Mr. L'Hotta a letter threatening legal action for these alleged misuses of its property. ECF No. 55 at 20–21. Mr. L'Hotta complied, and he sent a

letter back seeking confirmation that the issue between the two companies had been resolved. *Id.* In June 2016 Mionix again complained to Mr. L'Hotta through its lawyer about his use of its property, as well as about Mr. L'Hotta's use of the company name "ACS Technology" which it believed infringed on its trademark to the acronym "ACS." *Id.* In response, Mr. L'Hotta agreed to stop using the name ACS Technology and dissolved that company. *Id.* He then formed a new company named SAFE-pHix that is still in operation. *Id.*

In August 2016 Mionix filed the instant lawsuit against Mr. L'Hotta, ACS Technology, and SAFE-pHix and asserted eight claims for relief. ECF No. 39. Defendants answered and asserted three counterclaims against Mionix. ECF No. 55. Defendants' counterclaims arise from Mionix's behavior in 2010–2014, during which time Mionix apparently contacted several of ACS Technology's customers, potential customers, and its supplier Hydrite and told them that ACS Technology's product was illegal or unauthorized. *Id.* at 19–20. Mionix filed motions for summary judgment with regard to both its claims against defendants and defendants' counterclaims against it. ECF Nos. 63, 70. Both motions have been fully briefed and are ripe for this Court's review.

## STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id*. at 324. A dispute about a fact is material "if under the substantive law it is essential to the proper

disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc.* v. *City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## ANALYSIS

### A. Mionix's Motion for Summary Judgment on Its Affirmative Claims.

Mionix asserts eight claims against defendants: (1) Unfair Competition under the Lanham Act; (2) False Designation of Origin; (3) Federal Trademark Infringement; (4) Trade Dress Infringement; (5) Unfair Competition under Colorado law; (6) Trademark Infringement under Colorado law; (7) Violation of the Colorado Consumer Protection Act; and (8) Civil Conspiracy. ECF No. 39. Mionix seeks summary judgment regarding defendants' liability on all eight of these claims. ECF No. 63.

Defendants argue that summary judgment regarding their liability is improper for two reasons. First, defendants argue that each of Mionix's claims is barred by laches, the applicable statute of limitations, and/or Mionix's acquiescence.[1] ECF No. 79 at 10. Second, Defendants

---

[1] Defendants argue that the doctrine of laches defeats Mionix's motion for summary judgment. ECF Nos. 55, 79. They also note that Mionix failed to acknowledge their laches defense in its motion for summary judgment, and that on that basis alone Mionix's motion should fail. ECF No. 79 at 11. Mionix responds that it has no responsibility to address affirmative defenses in its motion for summary judgment as to liability, and that whether defendants ultimately will be able to prove their affirmative defenses at trial does not preclude entry of partial summary judgment in favor of Mionix as to liability at this stage. ECF No. 86 at 2. Because I find that material and genuine fact disputes exist as to each of Mionix's claims against defendants, I will not address defendants' affirmative defenses at this time.

argue that Mionix cannot show that their conduct created a "likelihood of confusion" as required to find liability for six of the eight claims, and that Mionix has not met its burden on the other two claims either. *Id.* After assessing the briefing and the law, I DENY Mionix's motion for summary judgment as to each of these claims.

   **1. Claims 1–6.**

Section 43 of the Lanham Act, 15 U.S.C. § 1125(a) provides that a person who engages in certain forms of unfair competition is liable in a civil action as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Mionix's claims for unfair competition (claim 1), trademark infringement (claim 2), false designation of origin (claim 3), and trade dress infringement (claim 4) all fall within the purview of the Lanham Act. A claim for violating this section of the Lanham Act will ultimately succeed if the accused party's alleged misuse of another's property created a "likelihood of confusion" for consumers as to the source of the competing products. *See*

*Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (affirming no Lanham Act violation on motion for summary judgment where a party could not establish a likelihood of confusion). Similarly, Mionix's claims for unfair competition under Colorado law (claim 5) and trademark infringement under Colorado law (claim 6) also require a "likelihood of confusion" analysis to be done to assess liability. *See Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1219 (10th Cir. 2004) ("Among other things, a plaintiff must establish . . . the likelihood of consumer confusion."). As such, I will analyze Claims 1 through 6 together to determine whether there is a genuine fact dispute as to whether defendants' alleged actions created a "likelihood of confusion" for consumers. "If the nonmovant demonstrates a genuine issue of material fact regarding the likelihood of confusion, [] summary judgment is not appropriate." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002).

Mionix asserts that there is no genuine issue of material fact as to whether defendants' actions created a likelihood of confusion, and that therefore summary judgment regarding defendants' liability is appropriate. Mionix points to several alleged transgressions on defendants' part as evidence that defendants' actions created a likelihood of confusion. First, while he was still under the licensing agreement with Mionix, Mr. L'Hotta sold ACS Technology's product LpH 100—which was not FreshFlo 100—under the name of Mionix's product FreshFlo 100. ECF No. 63 at 6. Further, after the licensing agreement ended, Mr. L'Hotta's website and a few invoices continued to make reference to Mionix product names, patents, and studies regarding Mionix products. *Id.* at 6; ECF No. 63-5 at 64-66. Mionix argues that defendants acted in this manner in an effort to mislead consumers into believing that ACS Technology's products were associated with Mionix. *Id.*

7

In the Tenth Circuit, Courts assess six factors to determine whether a likelihood of confusion exists, and no one factor is dispositive.[2] *Water Pik*, 726 F.3d at 1143. These factors are: (1) evidence of actual confusion; (2) the strength of the contesting mark; (3) the degree of similarity between the competing marks; (4) the intent of the alleged infringer in adopting the contested mark; (5) the degree of care that consumers are likely to exercise in purchasing the parties' products; and (6) the similarity of the parties' products and the manner in which they market them. *Id.*

I find that genuine issues of fact exist as to several of these factors. First, regarding "evidence of actual confusion," Mionix asserts that ACS Technology's only customer, BVS, was and remains actually confused about the relationship between Mionix and the product that BVS purchases from ACS Technology. ECF No. 63 at 17 ("[T]he evidence demonstrates that BVS believes Defendants' products include 'ACS 100' and 'pHixr 100' or, at a minimum, are the same as Defendants' LpH 100 . . . and that LpH 100 has obtained approval from the government."). However, defendants point to the deposition testimony of BVS' representative, Mr. Thorenson, which indicates that BVS and the customers to whom it provided ACS Technology products were never confused about ACS Technology's connections to Mionix. ECF No. 79 at 19. In Mr. Thorenson's deposition the following exchange occurred:

> "**Q**: Are you aware of any customers who were confused about what [Defendants'] product is? And by [Defendants'] product, I mean LpH 100?
> **A**: No. …

---

[2] Mionix proposes that this Court apply the nine-factor case espoused in *Studio 1712, Inc. v. Etna Prods. Co*., 777 F. Supp. 844, 851–52 (D. Colo. 1991), to determine likelihood of confusion. This is no longer the controlling test used by courts to determine likelihood of confusion, and as such this Court will analyze this case under the six-factor test described in *Water Pik*. 726 F.3d at 1143.

> **Q**: Are you aware of any customers who believed that [Defendants] w[ere] associated with Mionix?
> **A**: No, I am not. …
>
> **Q**: And has Mr. L'Hotta ever said or suggested that he is selling Mionix products?
> **A**: Again, currently no.
>
> **Q**: And to clarify, when you say 'currently no,' do you mean that he has never said or suggested that he has been selling Mionix products during the time period that he has sold products to you?
> **A**: Yes, exactly.
>
> **Q**: Are you aware of any customers who believed that LpH 100 was Mionix's FreshFlo product?
> **A**: No, I am not.

ECF No. 79-1 [Thorenson Depo. at 73:6–9, 73:25–74:25, 75:25–76:6.].

In addition, I find that a fact dispute exists as to the "intent of the alleged offender" factor. Mionix argues that Mr. L'Hotta's allegedly violative actions—such as leaving Mionix-related information on his website after the licensing agreement ended—were not mistakes or accidents, but instead that Mr. L'Hotta intentionally misused Mionix property for his own gain. ECF No. 63 at 16. Defendants respond that Mr. L'Hotta simply failed to update his website after his licensing agreement with Mionix ended and that any Mionix information that remained on his website was "unintentional and limited." ECF No. 79 at 22. In addition, defendants note that whenever Mionix's lawyer contacted Mr. L'Hotta regarding the alleged misuse of its property, Mr. L'Hotta promptly removed or altered the offending uses. *Id.* Therefore, I find that Mr. L'Hotta's intent with regards to these offending uses is reasonably in dispute.

Finally, I find that a fact dispute exists with regard to the similarity between the marks, specifically with regard to defendants' use of the acronym ACS. Mionix asserts that defendants' use of the acronym ACS impermissibly infringes upon its trademark for "ACS," but defendants

9

argue that ACS is merely an acronym describing a general chemical compound and therefore is not entitled to trademark protection. ECF No. 79 at 21 (citing *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1369 (10th Cir. 1977) ("Words which are merely descriptive of the qualities, ingredients, or composition of an article cannot be appropriated as a trademark and are not entitled to protection unless they have acquired a secondary meaning.")).

Thus, genuine fact disputes remain about whether the defendants' actions created a "likelihood of confusion" for consumers. As such, summary judgment on claims one through six is inappropriate.

### 2. Claim 7 (Colorado Consumer Protection Act).

Mionix also asserts that defendants violated the Colorado Consumer Protection Act ("CPPA"). To be entitled to summary judgment on this claim, Mionix must show that there are no genuine fact disputes as to whether: (1) the defendants engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of defendants' business, vocation, or occupation; (3) the challenged practice significantly impacts the public as actual or potential consumers; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged practice caused the plaintiff's injury. *Crowe v. Tull*, 126 P.3d 196, 201 (Colo. 2006) (emphasis added). "All elements of a CCPA claim must be met; otherwise the claim fails as a matter of law." *Id.*

To establish the first element, Mionix must establish that defendants made a false representation or otherwise engaged in unfair practices "with knowledge of its untruth, or recklessly and willfully [] without regard to its consequences, and with an intent to mislead and deceive the public." *Clancy Sys. Int'l, Inc. v. Image Sensing Sys., Inc.*, 2017 WL 3086624, at *4

10

(D. Colo. Jan. 30, 2017), adopted 2017 WL 3084915 (D. Colo. Feb. 17, 2017). Thus, Mionix must show that the defendants intended to mislead customers about the relationship between Mionix and ACS Technology's products. *Id.* As discussed above, a genuine fact dispute remains regarding Mr. L'Hotta's intent. *See* ECF No. 79 at 22 (defendants describing the offending uses as "unintentional" and noting that Mr. L'Hotta immediately remedied offending uses if/when Mionix pointed them out). Therefore, I deny plaintiff's motion for summary judgment with regard to the seventh claim as well.

### 3. Claim 8 (Civil Conspiracy).

Finally, Mionix asserts that defendants are liable for engaging in a civil conspiracy. To establish a claim for civil conspiracy, Mionix must show: (1) two or more persons; (2) c[a]me to a meeting of the minds; (3) on an object to be accomplished or a course of action to be followed; (4) and one or more overt unlawful acts are performed; (5) with damages as the proximate result thereof. *Loughridge v. Goodyear Tire & Rubber Co.*, 192 F. Supp. 2d 1175, 1186 (D. Colo. 2002) (referencing *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486 (Colo. 1989)). As such, this cause of action necessarily requires a finding of intent ("meeting of the minds") and liability ("one or more overt unlawful acts are performed"), both of which I have ruled cannot be decided at this stage because of genuine fact disputes that remain. *See id.* I therefore deny Mionix's motion for summary judgment on the civil conspiracy claim.

### B. Mionix's Motion for Summary Judgment on Defendants' Counterclaims.

Mionix also moves for summary judgment on defendants' counterclaims. ECF No. 70. Defendants have asserted the following counterclaims against Mionix: (1) Tortious Interference with Existing and Prospective Business Relations; (2) Business Defamation; and (3) Federal

Unfair Competition. ECF No. 55. Defendants allege that Mionix contacted several of ACS Technology's business contacts in an effort to discourage those parties from having a business relationship with ACS Technology.[3] *Id.* at 19–24. Defendants also provided evidence of several cease-and-desist letters that were sent to Mr. L'Hotta by Mionix's lawyer which communicated "exaggerated and over-reaching" threats and demands. ECF No. 82 at 2. Mionix does not deny contacting ACS Technology's business contacts nor does it deny sending the cease-and-desist letters, but it asserts that it acted within its rights in communicating that ACS Technology's products were "illegal" and "unauthorized" because ACS Technology was misusing Mionix's intellectual property and brand. ECF No. 82.

Because each of the counterclaims requires a showing that Mionix made statements that were in some way false or misleading, and because this Court has found that there are genuine fact disputes with regard to whether defendants are indeed liable for "illegal" or "unauthorized" use of Mionix's property, it is impossible to determine at this juncture whether Mionix's communications to ACS Technology's business contacts were improper. Put differently, my analysis of defendants' counterclaims necessarily hinges upon my factual findings regarding Mionix's affirmative claims. As such, I DENY Mionix's motion for summary judgment regarding defendants' counterclaims.

---

[3] Mionix contacted the following parties: ACS Technology's current customer BVS; ACS Technology's customer Dr. Bahl, who ultimately stopped doing business with ACS Technology after being contacted by Mionix; and ACS Technology's product supplier Hydrite. ECF No. 55 at 19–24.

DATED this 14th day of May, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge