IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 16-cv-02154-RBJ

MIONIX, LLC, a Nevada limited liability company; and
MIONIX CORPORATION, a Delaware corporation,

      Plaintiffs,

v.

ACS TECHNOLOGY (aka) Mionix CO.;
SAFE-pHix, LLC, a Wyoming limited liability company; and
WALTER LARRY L'HOTTA, an individual,

      Defendants.

---

## FINDINGS, CONCLUSIONS, ORDER OF JUDGMENT

---

      This case was tried to the Court June 4-6, 2018. The parties subsequently submitted post-trial briefs, which the Court has considered. For the reasons set forth in this order, the Court generally resolves the issues in favor of the plaintiffs and awards disgorgement of profits in the amount of **$31,678.65** plus reasonable attorney's fees, costs, and injunctive relief.

### FINDINGS OF FACT

      1.     Mionix, LLC is a Nevada limited liability company formed in 2015 when it acquired the assets of Mionix Corporation, a Delaware corporation. Mionix LLC has two members: Mionix Corporation and Frank Powell, a California resident. I will refer to Mionix Corporation and Mionix LLC collectively as "Mionix" unless the context requires otherwise.

2.  Mionix is a biotechnology company that, among other things, sells a product line called acidic calcium sulfate, often referred to as "ACS." This product is used to manage bacterial contamination in feed and food products.

3.  Mionix invested a great deal of time, effort and money in the research and development of its ACS products, including commissioning studies, applying for and receiving patent and trademark rights, and obtaining regulatory approvals.

4.  In the Spring of 2005 Mionix hired Larry L'Hotta as its National Sales Manager for its ACS products, and about one year later he was promoted to Director of Sales and Marketing. Mr. L'Hotta, a resident of Colorado Springs, Colorado, had served in the Special Forces, then completed a college degree in forensic science while working as a police officer, and then worked for several years in sales positions. He earned a master's degree in Strategic Marketing in 2009.

5.  Mr. L'Hotta's assignment was to help Mionix move out of the research and development stage and into the sales and marketing stage. The parties agree that Mr. L'Hotta excelled in his positions at Mionix, and that he helped the company generate good will in its ACS products and in the Mionix brand.

6.  Despite Mr. L'Hotta's efforts and successes, however, Mionix did not thrive financially. In about December 2006 Mionix informed its employees that it planned to close down operations in four to six months. Employees began to leave when they found other opportunities, but Mr. L'Hotta stayed on, hoping that the inroads he had made with potential new customers might cause the company to change its mind. He was finally laid off in August 2007.

7.      However, still convinced that the products he had been trying to sell were good products, and that he could sell them, Mr. L'Hotta proposed that he be allowed to continue to market the product as a licensee and pay Mionix a royalty on whatever he could sell.  Mionix agreed.

8.      To effectuate this agreement, Mr. L'Hotta formed a company called ACS Technology.  For a couple of months Mr. L'Hotta worked without a written contract, but on October 4, 2007 ACS Technology and Mionix entered into a written agreement entitled "Mionix and ACS License Agreement" ("License Agreement") that would govern their new business relationship.  Plaintiffs' Ex. 8.

9.      The License Agreement granted ACS Technology (a) a "non-exclusive" license (b) "to manufacture and have manufactured, market and have marketed, and sell and have sold" (c) "Licensed Products" (d) in a designated "Territory" (e) for a period of two years.  *Id* at ¶¶2.1, 8.1.

10.     The "Licensed Products" were ACS 100, ACS 50, RTE-01, RTE-03, FreshFlo 100, and pHixr 100.  *Id.* ¶1.2 and Schedule 1.

11.     The Territory was the United States, its territories and Mexico, excluding "any customers[] that have purchased products from Mionix in 2007 or that are currently evaluating or have evaluated in 2007 the use of Mionix products as of the date of this agreement."  *Id.* at ¶1.4.

12.     ACS Technology agreed to use commercially reasonable efforts to manufacture (or have manufactured), market and sell the Licensed Products, and to pay Mionix a royalty of 10% of Net Sales until Mionix had earned and received $75,000, at which point the royalty was

reduced to 6% of Net Sales. *Id.* at ¶¶3.1, 4.2. The first royalty payment was due within six months of the date of the agreement. *Id.* at ¶4.3.

13. As part of his marketing efforts, and consistent with the License Agreement, Mr. L'Hotta put the research studies that Mionix had commissioned, Mionix's patents, and Material Safety Data Sheets created for Mionix's products on ACS Technology's website. A Material Safety Data Sheet or "MSDS" provides safety information concerning the product's ingredients and what to do in case of a spill or other emergency.

14. Mionix had been using Hydrite Chemical Company as a "toll manufacturer" of its ACS products, meaning that Hydrite manufactured the products according to the formulations provided by Mionix.

15. Michael Cunha was, at the time, the Chairman of the Board and President of Mionix Corporation (Mionix, LLC did not yet exist). He sent a letter to Hydrite dated October 16, 2007 informing Hydrite of the License Agreement and authorizing Hydrite to manufacturer and ship Mionix products to ACS Technology and its customers on approved orders by either Mionix or ACS Technology. Plaintiffs' Ex. 22 at 2.

16. There is a dispute about whether Mr. L'Hotta paid royalties during the first few months of the License Agreement. He says he paid a small amount in the range of $500 or so. Mr. Cunha testified that Mr. L'Hotta asked whether he could accumulate royalty obligations rather than pay in small dribs and drabs, and that he approved this, but Mionix never received any royalties. Regardless, it does not appear that any significant sales were made during the early months.

17.     During those same early months of the two-year term of the License Agreement the problems that ultimately resulted in the lawsuit began to surface. The first red flag was hoisted when Mr. L'Hotta discovered that Mionix had developed or was trying to develop an arrangement with a company called Ivesco to purchase or distribute Mionix's ACS products.

18.     Mr. Cunha believes he told Mr. L'Hotta that Mionix planned to reorganize and minimize the company in order best to deal with the financial constraints the company was facing. Mionix also had a potential opportunity in China that Mr. Cunha hoped would generate cash that could be used to bolster Mionix's U.S. operations. Mr. Cunha might have said these things. However, he did not clearly disclose to Mr. L'Hotta when they were negotiating the License Agreement that Mionix might stay in the business and compete with him.

19.     Nevertheless, the terms of the License Agreement should have been a clue that Mionix was having second thoughts about dropping out of the ACS business. As I have noted, the License Agreement made his license "non-exclusive," and it carved out from ACS Technology's territory any customers or prospects Mionix had in 2007. It appears that Mr. L'Hotta signed the License Agreement as drafted by Mionix without thinking too much about what some of the terms might mean for him.

20.     When Mr. L'Hotta learned about Mionix's plans he decided that Mionix no longer supported the License Agreement. He learned that Mionix had purchased all or at least a substantial part of Hydrite's remaining inventory of ACS products, probably FreshFlo 100, and he thought that this was done so that ACS Technology wouldn't have a supplier. He also believed that Mionix had informed Hydrite that Hydrite was no longer allowed to sell ACS

products to him.  In Mr. L'Hotta's words, Mionix "cut me off from product, from my supplier," leaving him with "no product to sell."

21.     According to Mr. Cunha, however, what actually happened is that in late 2007 or early 2008 Hydrite informed Mionix that it was not willing to continue to manufacture products for Mionix because Mionix was not purchasing enough product and was behind in paying its bills.  At that time Hydrite had 48 totes of product in inventory.  Mionix purchased some of them in order to have product to supply its own customers until it could find a new manufacturer.  Later, when Hydrite was down to nine remaining totes, it demanded that Mionix purchase those "as part of our settlement," which Mionix did.  It is not clear how many of the 48 totes Mionix purchased, and if not all of them, what happened to the remainder.

22.     Mr. Cunha denies that that Mionix wanted to terminate the License Agreement.  According to him, Mionix wanted Mr. L'Hotta to make sales and pay royalties.  There is no written evidence that Mionix tried to terminate the License Agreement or that either side ever declared that the License Agreement was terminated.  However, Mionix's conduct during most of the remainder of the term of the License Agreement indicates that its desire to support ACS Technology and Mr. L'Hotta was lukewarm, at best.  Mionix was again attempting to sell its ACS products, and as discussed below, Mionix seemingly paid no attention to the fact that it was not receiving communications or royalties from Mr. L'Hotta.

23.     Nevertheless, Mr. L'Hotta feared that his relationship with Mionix was probably over.  He sent a letter to Mr. Cunha on March 21, 2008 in which he expressed unhappiness about Mionix's competing with him for business.  Defendants' Ex. G2.  He stated that he would not have entered into the License Agreement if he had thought that Mionix would be reentering the

food industry market.  After indicating that he hoped that their relationship could get back on track, he offered in the alternative to negotiate a termination of the License Agreement for "an acceptable compensation."  *Id.*  Mionix did not respond to his letter.

24.     Mr. L'Hotta also decided that he could no longer sell products manufactured to Mionix's proprietary formulations.  I find no evidence in the record that supports that perception.  Mr. Cunha denies that Mionix informed Hydrite that it no longer wanted Hydrite to provide Mionix products to Mr. L'Hotta or his company.  Mionix never retracted the October 16, 2007 letter authorizing Hydrite to supply product to ACS Technology during the term of the License Agreement.  Notably, Hydrite did not perceive that Mionix wanted it to stop selling Mionix products to Mr. L'Hotta.  Indeed, there is no evidence that Mr. L'Hotta even asked Hydrite to continue manufacturing the Mionix formulation for ACS Technology.

25.     But Mr. L'Hotta decided that he needed a new product to sell.  After searching a little bit for another manufacturer, Mr. L'Hotta went to Hydrite and asked whether it could develop another formulation.  From this point forward I will focus primarily on one product, FreshFlo 100, which is used to improve the quality of drinking water in the poultry industry.  It is just one of the six Licensed Products, but it is at the center of the parties' present dispute.

26.     Hydrite did develop a new formulation.  Christopher Lorang, Hydrite's Product Quality Manager, was deposed in this case as Hydrite's Rule 30(b)(6) representative.  The deposition is marked as Plaintiffs' Ex. 114 with the parts presented to the Court by video highlighted.  He testified that the two formulations differ in terms of raw materials, reaction chemistry and the manufacturing process.  *Id.* at 25.  One significant difference is that the

original formulation contains calcium hydroxide, but the formulation Hydrite developed for Mr. L'Hotta does not. *Id.* at 27.

27.     Once the new formulation was available, it was the only formulation that Mr. L'Hotta marketed or sold. Mr. L'Hotta called the new formulation FreshFlo, the name of the Mionix product. He claims that it was his right to use that name under the License Agreement, but he otherwise acted as if the License Agreement was no longer in effect. He did not notify Mionix that he was no longer attempting to market Mionix's formulation of FreshFlo (or other Mionix products), or that he was marketing a different formulation under the name FreshFlo. He did not pay royalties.

28.     As Mr. L'Hotta moved ahead with his new product he represented on his website that his product had USDA and FDA approval, that it was a patented product, and that it was based on studies and tests. None of these representations was true. Essentially, he piggybacked on Mionix's studies, tests, intellectual property, and regulatory approvals as if they all applied to the product he was selling.

29.     Mr. L'Hotta says that he learned that customers were complaining and returning shipments of the old formulation of FreshFlo because the chemicals separated from the water while the product sat on shelves in bottles. Mr. L'Hotta claims that the new formulation did not have that problem, so sometime during 2009, still within the term of the License Agreement, he renamed his formulation LpH 100.

30.     Thus, during the majority of the License Period ACS Technology was actively marketing and selling his new formulation, first under the name FreshFlo 100, later as LpH 100. He was not paying royalties or communicating with Mionix. Meanwhile, Mionix, which of

course was not receiving royalties, was not communicating with Mr. L'Hotta. Both sides now claim that the License Agreement remained in effect, but neither party acted like it at the time.

31.     Mionix claims that ACS Technology sold some product to Mionix's customers, including De-Chem. If sales were made to buyers who were customers or prospects being evaluated by Mionix in the year 2007, then any such sales would be in violation of the License Agreement. If such sales were made to customers not falling into that category, then either it would be a violation of the requirement in the License Agreement that ACS use commercially reasonable efforts to market Mionix's products or ACS Technology would have owed royalties to Mionix. However, neither Mionix nor ACS Technology seemed to pay much attention to the requirements of the License Agreement at the time. Mionix has not claimed entitlement to any additional royalties under the License Agreement.

32.     After the License Agreement expired in October 2009 ACS Technology continued to market and sell LpH 100. It also sold occasional small amounts of RTE-01, ACS 100 and FreshFlo 100 which were Mionix products that were included as Licensed Products during the term of the License Agreement but which Mr. L'Hotta and ACS Technology no longer had a license to sell. Nevertheless, approximately three and a half more years went by without a word from Mionix.

33.     Things changed in the spring of 2013. On March 28, 2013 an attorney for Mionix, Sudee Mirsafian Wright of Husch Blackwell's Denver office, sent a letter to Mr. L'Hotta accusing him of unlawfully using the FreshFlo trademark "in connection with the manufacture, sale and distribution of a competing and substantially identical product." Plaintiffs' Ex. 19. She demanded that he cease using the FreshFlo trademark or any derivative of

it, and that he similarly stop using any label or MSDS "that includes test results or other data generated for Mionix's Product." *Id.* Ms. Wright informed Mr. L'Hotta that Mionix would consider legal action against him, and would report ACS Technology's wrongful conduct to the United States Department of Agriculture and the Food and Drug Administration, if he did not comply. *Id.*

34.     On the same day Ms. Wright sent a similar demand letter to Hydrite, accusing Hydrite of manufacturing an infringing product for Mr. L'Hotta and threatening Hydrite with legal action and reports to the USDA and the FDA if it did not desist.  Plaintiffs' Ex. 21.

35.     Mr. L'Hotta promptly responded to Ms. Wright's demands, indicating that he would comply. *See* Plaintiffs' Ex. 20.

36.     Hydrite's General Counsel, David R. Beine, responded by calling counsel's attention to the October 16, 2007 letter that authorized Hydrite to manufacture and ship Mionix products to ACS Technology and its customers.  Plaintiffs' Ex. 22.[1]  After a telephone conversation with Ms. Wright, however, Mr. Beine indicated that Hydrite would comply with her requests.  Plaintiffs' Ex. 23.

37.     Defendants argue that Mr. L'Hotta did try to clean up ACS Technology's website and remove Mionix's references and information, but that he was negligent and inadvertently failed to remove everything he should have.  This is supported by Mr. L'Hotta's testimony to the same effect.  However, I do not find that testimony to be credible.  Mr. L'Hotta was an educated and experienced salesman.  Removing information that pertained strictly to Mionix and Mionix's research, studies, patents and regulatory approvals from a website was not a difficult task.  Even

---

[1] Mr. Lorang confirmed in his deposition that in April 2013 Hydrite understood that ACS Technology was still acting under agreement with Mionix.  Ex. 114 at 35.

if I were to give Mr. L'Hotta the benefit of the doubt and accept that suggestion that his shortcomings were just a matter of oversight, his later history of continuing to offend in the same way again and again dispels that notion.

38.     Nevertheless, Mionix did nothing further at that time.

39.     Up to that point ACS Technology had not been particularly successful.  But in late 2013 a company called Best Veterinary Solutions, Inc. ("BVS") was looking for an acid that would convert sodium chlorite to chlorine dioxide in water sanitation products more efficiently than the acid that BVS had been using.  Ross Thoreson, BVS's Sales Manager testified in the present case by way of a videotaped deposition taken of him as a representative of BVS pursuant to Rule 30(b)(6).  Plaintiffs' Ex. 115 (highlighted portions were shown during the trial).  He testified that he found ACS Technology in a Google search and contacted Mr. L'Hotta.  *Id* at 8-10.  After conducting some trials, BVS made its first purchase of LpH 100 on March 13, 2014.

40.     Mr. Thoreson acknowledged that he had seen ACS Technology's website during his search for a supplier for the product he needed.  ECF No. 115 at 11.  However, he did not say, nor was there any other evidence, that the representations in the website about studies, patents or regulatory approvals had anything to do with his decision to give ACS Technology his business.[2]  He testified that he made that decision because testing showed that the product met BVS's needs, and it was manufactured by Hydrite in Waterloo, Iowa, approximately 45 miles from BVS's headquarters in Ellsworth, Iowa.  *See id.* at 13, 24.  BVS's first purchase of LpH

---

[2] Mionix in its post-trial brief admits that "BVS apparently was not influenced by the numerous false statements on Defendants' websites."  ECF No. 128 at 4.

100 after it completed its investigation of the product apparently occurred in March 2014.  *Id.* at 50.

41.    Eventually sales of LpH 100 to BVS had a dramatic effect on ACS Technology's business.  Defendants' Total Sales, as shown in Plaintiffs' Ex. 111, show about a 70% increase from 2014 to 2015, another 95% increase from 2015 to 2016, and another 54% increase from 2016 to 2017.[3]  Put another way, defendants' total sales in 2017 were approximately four times their sales in 2014.

42.    However, despite his past assurances he still had not cleaned up ACS Technology's website, which continued to make improper references to Mionix's materials.  One thing he apparently did was to substitute "ACS Technology" for "Mionix" in various places on the website, which if anything made the misrepresentations worse.

43.    Plaintiffs' Ex. 83 and Ex. 84 are screen shots of pages of the website in about July and August 2015.  It describes LpH 100 as patented technology and states that LpH 100 was "FDA and USDA Approved."  The website also asserted that another product, ACS 100, was an ACS Technology product.[4]  It used Mionix's pumpkin pie study for ACS 100 as if it had been done for ACS Technology.  It posted a Mionix MSDS.  It referenced research studies and tests as if they had been done for ACS Technology on LpH 100 or other ACS Technology products.  None of these representations was true.

---

[3] The Total Sales chart is incomplete.  There are gaps in every year from 2008 through 2012 and again in 2015 and 2016.  The numbers in the chart for 2014 ($82,737) and 2017 ($420,321) are for all 12 months.  If one annualizes 2015 and 2016, the numbers would be $140,300 in 2015 and $272,983 in 2016.

[4] SAFE-pHix sold some ACS 100 as recently as May 2018.  He claims that it was a mistake – he thought it was LpH 100.  Tr. at 88.

44.     On August 5, 2015 another lawyer for Mionix, Patrick D. Kuehl, Jr. of the Kansas

City office of Husch Blackwell, sent a letter to Mr. L'Hotta asserting that ACS Technology's

website, which he claimed was essentially a copy of Mionix's website, still displayed Mionix's

patents, toxicity data and regulatory approvals as if they applied to LpH 100.  Plaintiffs' Ex. 32.

He also asserted that ACS Technology's label on its one gallon bottle of LpH 100 was a copy of

Mionix's copyrighted label.  He indicated that Mionix would pursue its equitable and legal

remedies if he didn't hear from Mr. L'Hotta by August 12, 2015.  *Id.*

45.     With respect to the label, the evidence is, and the Court finds, that the label on

ACS Technology's product LpH was not something that Mr. L'Hotta copied from Mionix.

Rather, Mionix or its new distributor Ivesco copied a label that Mr. L'Hotta created for use by

ACS Technology during the term of the License Agreement.  Defendants' Ex. J2 illustrates that

the Ivesco label apparently still contains ACS Technology's address (partly visible in the upper

right corner), and the phrase "Animal Drinking Water Acidulant" that is prominently displayed

on the label uses the same second but backwards quotation mark as was mistakenly placed in the

label by Mr. L'Hotta.

46.     On the same date Mr. Kuehl sent a demand letter to Hydrite asserting that

Hydrite's manufacture of LpH 100 for ACS Technology and Mr. L'Hotta infringed Mionix's

patents, misappropriated Mionix's trade secrets, and violated the agreement that Hydrite's

General Counsel had made with Mionix's previous lawyer in 2013.  Plaintiffs' Ex. 34.  He

demanded that Hydrite cease and desist further manufacture or sale of LpH 100 and threatened

legal action if it did not.  *Id.*  That caused Hydrite to engage counsel, who in turn sent a sharply

worded letter to Mionix's counsel dated August 28, 2015 explaining the difference between

Mionix's product and ACS's product LpH 100. Plaintiffs Ex. 36. In addition to denying infringement, Hydrite demanded that Mionix cease using a Material Safety Data Sheet for pHixr on Mionix's website containing a reference to Hydrite as the manufacturer. *Id.*

47.     Attorney Kuehl also sent a letter to the President of BVS on August 5, 2015 accusing BVS of infringement and misappropriation of trade secrets and demanding that BVS cease further distribution or sale of LpH 100. Plaintiffs' Ex. 33. As with the letters to ACS Technology and Hydrite, Mr. Kuehl on behalf of Mionix threatened legal action. *Id.* That letter, as Mr. Thoreson confirmed in his deposition, did not sit well with BVS.

48.     Mr. L'Hotta responded to Mr. Kuehl's letter with emails on August 11 and 13, 2015, but his responses were not deemed to be satisfactory. Mr. Kuehl sent another cease and desist letter to Mr. L'Hotta on August 21, 2015. Plaintiffs' Ex. 35. Those letters still did not get the job done. For example, plaintiffs' Ex 85 is another screen shot of the ACS Technology website that Mr. Cunha pulled sometime in 2016 displaying some of the same issues.

49.     In August 2016 Mr. L'Hotta dissolved ACS Technology and formed a new company called SAFE-pHix. It amounted in substance to a re-naming of his company. SAFE-pHix does not have a website. As with ACS Technology, Mr. L'Hotta did not commission studies or obtain regulatory approvals, but there is no evidence that he is misusing Mionix's materials any longer.

50.     BVS buys LpH 100 from SAFE-pHix and redistributes the product to BVS's customers. Effective June 1, 2017 BVS has had an exclusive distributorship for LpH 100 and other SAFE-pHix products for animal health applications. *See* Plaintiffs' Ex. 90. One provision of their distributorship agreement that particularly irks Mionix is paragraph 3.1(H), in which

BVS agrees to notify SAFE-pHix of any of its customers who are using competing products and to work with SAFE-pHix to try to switch them to SAFE-pHix products. Mionix interprets that paragraph as an agreement to try to pry Mionix's ACS customers away from Mionix.

51.     BVS now accounts for nearly all of SAFE-pHix's sales and profits. Essentially, SAFE-pHix supplies one product, LpH 100, to one customer, BVS.

52.     There is no evidence that BVS would have in the past given any of its business to Mionix or that it will do so in the future. Mr. Thoreson testified that if BVS stopped using LpH 100 it would turn to a company called Zoetis (for which BVS is a distributor) and its product Proxor. There are other sulfuric acid products on the market he could also consider. However, when asked whether he would consider purchasing products from Mionix, he bluntly answered, "no."

53.     Mr. Thoreson also testified that the cease and desist letter from Mionix's counsel did not cause BVS to change its relationship with SAFE-pHix.

54.     Mionix filed the present lawsuit on August 24, 2016. The Third Amended Complaint asserts six claims for relief: (1) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (2) false designation of origin; (3) federal trademark infringement; (4) trade dress infringement in violation of 15 U.S.C. § 1125(a); (5) common law unfair competition; and (6) civil conspiracy. ECF No. 109. Mr. L'Hotta counterclaims based on theories of (1) tortious interference with existing and prospective business relations and (2) business defamation. ECF No. 115.

## CONCLUSIONS INCLUDING ADDITIONAL FINDINGS

## I. **PLAINTIFFS' CLAIMS**.

### A. **False Advertising**.

Mionix states that its primary claim is false advertising. Plaintiffs' Closing Argument Brief, ECF No. 128 at 5. Plaintiffs First Claim for Relief asserts unfair competition by false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). Section 43(a) "is one of the few provisions that goes beyond trademark protection." *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 29 (2003). It is not a codification of the whole law of unfair competition, but it can be applied to "certain unfair trade practices prohibited by its text." *Id.*

The statute states,

> Any person who, on or *in connection with any goods* or services, or any container for goods, *uses in commerce* any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or *false or misleading representation of fact*, which –
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as the affiliation , connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) *in commercial adverting or promotion, misrepresents the name, characteristics, qualities, or geographic origin of his or her or another person's goods*, services, or commercial activities,
>
> Shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (emphasis added).

Mr. L'Hotta negotiated a License Agreement that permitted him to represent himself as a distributor of Mionix products for two years. But after a few sputtering attempts to market Mionix's products, and because he perceived that Mionix was trying to put him out of business, he effectively abandoned the License Agreement. Instead, he launched into the marketing and sale of his new formulation of a product that was similar to, but different from, the Mionix product he was licensed to sell. He copied the name of Mionix's trademarked product for his product without informing Mionix or having any legal right to do so. He represented that the product he was selling was backed by the research studies and tests that Mionix had conducted for its products; that it was protected by the patents that Mionix had obtained for its products; and that it enjoyed regulatory approvals that were only granted to Mionix's products. Those representations were false. Mionix is a corporate "person who believes that [it] is or is likely to be damaged by such act." *Id.*

The Court thus resolves plaintiffs' First Claim for Relief (Unfair Competition in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)), in favor of the plaintiffs. I will address the remedies later in this order. The Court concludes that plaintiffs' Second Claim (False Designation of Origin) and the Fifth Claim (Common Law Unfair Competition) are either duplicative of the First, Third and Fourth Claims or are moot.

**B. Trademark and Trade Dress Infringement and Common Law Unfair Competition.**

Defendants infringed Mionix's trademark in the name "FreshFlo" or "FRESHFLO," when Mr. L'Hotta named the new formulation of the product that Mionix had developed "FreshFlo 100." I note again that the new formulation was not just a modification of the Mionix

formulation. If it had been, then Mionix would have had a non-exclusive, royalty-free right to use that formulation during the term of the License Agreement and arguably might have a claim to ownership of the formulation even today. *See* License Agreement, Plaintiffs' Ex. 8, at ¶5.2. Mionix makes no such claim. Rather, both parties appear to recognize that the new formulation is different from the Mionix formulation, which eliminates patent issues but not trademark issues.

Mionix also asserts trade dress infringement arising from labels used on bottles of LpH 100. As I have found, *supra* at 13, ¶45, at least with respect to the FreshFlo label used by Mionix's distributor Ivesco, the evidence is that Mionix or Ivesco copied a label designed by Mr. L'Hotta for ACS Technology, not the other way around. However, the fact that Mr. L'Hotta created the label for use by ACS Technology during the License Period did not give him the right to copy and use a nearly identical label for his LpH 100 product or other products.

To establish trademark or trade dress infringement Mionix must establish (1) protectable rights in the trade mark or trade dress and (2) likelihood of consumer confusion as to the source of the competing products. *Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research,* 527 F.3d 1045, 1058 (10th Cir. 2008). Mionix did not establish a protectable right in the label. Mionix did, of course, have a protectable right in the trademark FreshFlo. However, there was no evidence of any significant confusion or likelihood of confusion. The Court resolves plaintiffs' Third and Fourth Claims in favor of the defendants.

**C. Civil Conspiracy.**

Plaintiffs claim that Mr. L'Hotta and ACS Technology, LLC conspired with SAFE-pHix, LLC to carry out the unlawful goal of violating Mionix's rights under the Lanham Act. One

can't conspire with oneself. L'Hotta, in substance, simply changed the name of his company, in the process eliminating the use of "ACS" and abandoning the website that stirred up such controversy. The Court resolves the Sixth Claim in favor of the defendants.

## II. DEFENDANTS' TIMELINESS DEFENSES.

Defendants assert, as affirmative defenses, that Mionix's claims are barred either by laches or the statute of limitations. The Lanham Act does not contain a statute of limitations. In that circumstance courts either apply the most analogous state period of limitations, *e.g.*, *Full Draw Productions v. Easton Sports, Inc.,* 85 F. Supp. 2d 1001, 1010 (D. Colo. 2000) (applying three-year Colorado statute of limitations for fraud, misrepresentation, concealment and deceit); or they apply the equitable defense of laches, *e.g. Yeager v. Fort Knox Security,* 602 F. App'x 423, 430-31 (10th Cir. 2015) (unpublished) (applying laches).

Laches is built into the Act itself. 15 U.S.C. § 1115(b)(9) ("[E]quitable principles, including laches, estoppel, and acquiescence are applicable."). Therefore, I am inclined to agree with Judge Miller that "analogous state statute of limitations period provides only guidance in the application of a laches defense." *Prince Lionheart, Inc. v. Halo Innovations, Inc.,* No. 06-cv000324, 2008 WL 878985, at *4 (D. Colo. March 28, 2008) (citing *Lawson v. Haynes,* 170 F.2d 741, 744 (10th Cir. 1948)).

Plaintiffs knew about defendants' infringing activities at least by March 28, 2013 when plaintiffs' counsel sent the first cease and desist letter to Mr. L'Hotta. However, defendants' offending conduct continued to occur until early August 2016 when Mr. L'Hotta took the website down and closed ACS Technology. Accordingly, if the state three-year statute of

limitations applied, I would find that plaintiffs' complaint was barred as to defendants' conduct predating August 24, 2013 but not thereafter due to the continuing nature of the violation.

I will not apply the state statute as such, but I conclude it provides reasonable guidance for the application of the laches defense. The elements of laches are (1) unreasonable delay in asserting a claim and (2) prejudice to the defendant caused by the delay. *See Hutchinson v. Pfeil,* 105 F.3d 562, 564 (10th Cir. 1997). It was reasonable for Mionix to have given Mr. L'Hotta some reasonable period of time to comply with its March 28, 2013 demands. However, Mionix and its lawyers could easily access ACS Technology's website and see that Mr. L'Hotta did not comply. Mionix did not follow up on its threats of legal action. Another two years passed until August 5, 2015 when the guns came out again. Again, Mr. L'Hotta did not fully cease and desist, and Mionix let more than another year go by before he took the website down. I find that the delay in filing the complaint was unreasonable. I also find that the delay was prejudicial in the sense that their exposure to equitable or legal remedies grew during that period of time.

By the same token, the increased exposure reflected their continuing misconduct. Were it not for that, I would hold that plaintiffs' claims are barred by laches. Because of the continuing nature of the wrongdoing, however, I find that the three-year statute of limitations provides reasonable guidance. The Court holds that plaintiffs' claims are barred by laches to the extent that they concern conduct that occurred before August 24, 2013 but are not barred as to conduct occurring after that date.

## III. DEFENDANTS' COUNTERCLAIMS.

### A. Tortious Interference with Existing and Prospective Business Relations.

Mionix tried to commit this tort.  Its lawyer's demand letters to Hydrite and BVS were based on incorrect assumptions as to the facts, were excessive in their threats, and were altogether unwarranted.  Luckily for Mionix, its efforts to discourage Hydrite and BVS from continuing to do business with Mr. L'Hotta and ACS Technology were unsuccessful.  There is no evidence that Mionix has successfully but improperly interfered with any other customers or prospective customers of Mr. L'Hotta or ACS Technology or SAFE-pHix.  Accordingly, this counterclaim is resolved against the defendants.

### B.  Business Defamation.

In large part the things Mionix's attorneys said in the letters they sent to Hydrite and BVS about Mr. L'Hotta's conduct were true.  To any extent those letters can be interpreted as containing false or misleading statements about Mr. L'Hotta or ACS Technology, there is no evidence that the alleged defamation caused any harm to come to them.  The Court resolves the business defamation counterclaim against the defendants.

## IV.  REMEDY.

### A.  Injunctive Relief.

ACS Technology, Inc. no longer exists.  SAFE-pHix has no website.  There is no evidence that SAFE-pHix is using Mionix's information and materials in his marketing and selling of LpH 100 to its only present customer, BVS.  Nevertheless, while perhaps unlikely, I do not rule out the possibility that Mr. L'Hotta might try to market his product(s) to new customers, and history tells us that he is all but incorrigible when it comes to piggybacking on Mionix.  Accordingly, the Court permanently enjoins Mr. L'Hotta from selling any Mionix product without Mionix's permission and from referring to Mionix's products, studies, research, testing,

patents, trademarks, trade dress, regulatory approvals or other property in any marketing, labeling or selling of products in the future, whether through his company SAFE-pHix or any other commercial vehicle or enterprise. The Court concludes that the potential harm to Mionix of any such acts outweighs any harm to the defendants, promotes the public interest in fair competition, and is in the interest of justice.

**B.  Damages/Disgorgement.**

The Lanham Act provides for a number of possible remedies, all expressly being subject to the principles of equity: "(1) defendants' profits, (2) any damages sustained by the plaintiffs, and (3) the costs of the action."  15 U.S.C. § 1117(a).  Mionix does not seek an award of damages, nor could I find that Mionix has sustained any significant or measurable damage. Rather, Mionix seeks disgorgement of unlawfully obtained profits and the costs of the action. *See* Post-Trial Brief, ECF No. 128, at 11.  Disgorgement of profits is permitted if the defendants' actions were willful. *See Western Diversified Services, Inc. v. Hyundai Motor America, Inc.,* 427 F.3d 1269, (10th Cir. 2005); *Bishop v. Equinox International Corp.*, 154 F.3d 1220, 1223 (10th Cir. 1998) (willful or in bad faith).

Initially, Mr. L'Hotta perceived that Mionix was dissatisfied with the License Agreement and wanted to put him out of business.  I will assume that this perception was sincerely held. Certainly Mionix's conduct during the term of the License Agreement did little to dispel it.  Still, Mr. L'Hotta is an educated, intelligent, and experienced salesman.  He at least should have known from the day he launched the new product that some of what he was doing was wrong.

However, even assuming that he did not initially connect the dots, the "oversight defense" evaporates after Mionix's lawyers began their campaign of demands and threats.  Mr.

L'Hotta announced that he would comply, but he did not. Mionix issued more demands and threats. Again, Mr. L'Hotta did not comply. Mionix and its lawyers didn't always have their facts straight. Their demands and threats to third parties unsurprisingly generated angry responses and ill will. But the fact remains that Mr. L'Hotta continued to exploit Mionix's research, patents and regulatory approvals despite Mionix's demands and Mr. L'Hotta's assurances to the contrary. He was a copycat who was willing to continue to milk the work conducted by and for Mionix.

Accordingly, I find that Mr. L'Hotta's false representations in his advertising, at the very least after he failed to comply with the March 28, 2013 cease and desist letter, were not a matter of innocent oversight. Rather, his continuing violation of the Lanham Act, again at least after that time, was willful and deliberate. Therefore, I conclude that disgorgement is an available and appropriate remedy.

Mionix seeks disgorgement of profits earned by defendants from February 2008 (when defendants began to sell his own formulations of Mionix's products) through May 2018. To arrive at an amount Mionix begins with Plaintiffs' Ex. 111, the summary chart of "Defendants' Total Sales" discussed earlier in this order. This chart purports to show defendants' total sales from February 2008 through May 2018, although there are a number of gaps in it. The information that is shown totals $1,397,057.99. Another summary chart, Defendants' Ex. W1, purports to provide "Defendants' Annual Product and Shipping Costs" for the years 2009 through 2018. It is not clear what "product costs" are included. The total shown is $688,201.52. The mathematical difference between the two numbers is $708,856.47. Mionix argues that defendants' net profits during the relevant timeframe must have been at least that much.

Accordingly, Mionix asks the Court to order defendants to disgorge $708,856.47, i.e., to pay that amount to Mionix. ECF No. 128 at 13.

There are several problems with plaintiffs' number. First, the two charts cover different time periods. That problem is largely fixable. The "total sales" in Plaintiffs' Ex. 111 are indicated on a monthly basis. If the 2008 numbers and the January through September 2009 numbers on the total sales chart are omitted, then at least the two charts will purport to cover the same period of time.

Second, although it is unclear what costs are included as product costs, Mionix acknowledges that Ex. W1 probably does not include all of defendants' costs. *See* ECF No. 128 at 13. Mionix addresses this problem by arguing that it was the defendants' burden to prove their costs. *See General Steel Domestic Sales, LLC v. Chumley,* No. 10-cv-01398-PAB-KLM, 2013 WL 1900562, at *18 (D. Colo. 2013, *aff'd,* 627 F. App'x 682 (10th Cir. 2015) (unpublished) ("In determining profits on which to base a disgorgement award, a plaintiffs must prove 'defendants' sales only; defendants must prove all elements of cost or deduction claimed.'") (citing 15 U.S.C. § 1117(a)). I agree.

The third problem is that there is no evidence that any particular sales were attributable to unlawful activity. Mionix again turns to *General Steel* to solve the problem. 2013 WL 1900562 at *18: "[O]nce plaintiff has established the amount of defendant's gross profits, such profits 'are presumed to be the result of the infringing activity' and the defendant 'bears the burden of showing which, if any, of its total sales are not attributable to the infringing activity." Again, I agree.

Putting all this together, I begin by eliminating profits earned prior to August 24, 2013.  I earlier found that Mionix's claims arising actions before that date are barred by the equitable doctrine of laches.

Second, I eliminate profits from 2015 forward.  I have described the dramatic increase in profits that defendants realized in 2015, 2016 and 2017.  The numbers are consistent with the statement in defendants' post-trial brief that "[i]n 2015, Defendants' sales of LpH 100 began to grow, driven entirely by BVS."  ECF No. 129 at 4.  I find that the vast majority if not nearly all of defendants' profits during those years resulted from its relationship with BVS, and that the sales to BVS were not the result of defendants' unlawful activity.  I cannot completely rule out the possibility that defendants might have made some sales other than to BVS which might have been attributable in part to the wrongful conduct.  However, those sales, if any, are offset by the fact that defendants sold some amount of LpH 100 to BVS in 2014; the first sale occurred in March 2014.  The offset probably isn't perfect, but it's sufficient in determining an equitable remedy.

I therefore conclude that defendants have met their burden of showing that the sales and profits in 2015 and after probably were not attributable to the unlawful activity.  Thus, the relevant period for disgorgement is approximately 16 months, i.e., August 24, 2013 through December 31, 2014.  For August 2013 I will count 7/31sts of the reported August sales, i.e., 7/31sts of $6954.78 or $1570/43.  *See* Plaintiffs' Ex. 111.  For costs in that seven-day period I

will take 7/365th of the reported costs for 2013 of $27,789.23 or $532,94. *See* Defendants' Ex. W1. [5] Thus the Court orders disgorgement of $1,037.49 for that seven-day stub period.

I calculate disgorgement for September 2013 through December 2014 as follows. Defendants' total sales during that period per Plaintiffs' Ex. 111 were $97,413.04. I again use Defendants' Ex. W1 as indicative of costs. I add one-third of defendants' 2013 costs (4 of 12 months), totaling $9,263.07, because costs are not broken out monthly. That 2013 number plus the costs shown in Defendants' Ex. W1 for 2014, $39,096.00, totals $66,771.46. Accordingly, the net profits during the relevant time period totaled $30,641.16.

Accordingly, I order defendants to disgorge to plaintiffs a total of **$31,678.65** ($1,037.49 plus $30,641.16).

### E. **Attorney's Fees**.

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The Tenth Circuit has held that an "exceptional case" under this statute, at least in the trademark context, "is one in which the trademark infringement is 'malicious, fraudulent, deliberate, or willful.'" *Western Diversified Services,* 427 F.3d at 1273 (quoting *VIP Foods, Inc. v. Vulcan Pet., Inc.,* 675 F.2d 1106, 1107 (10th Cir. 1982)). I conclude that that same test, i.e., willfulness, is reasonable to apply to any violation of 15 U.S.C. § 1117(a). I have found that Mr. L'Hotta's continued use of Mionix's research, studies, patents

---

[5] There is another chart, Defendants' Ex. A1, that purports to show various ACS Technology expenses on an annual basis. However, I am unable to determine on the face of the charts whether or to what extent they overlap. If one adds the purported costs for the year 2014 from both Defendants' Ex. A1 and Defendants' Ex. W1 together, the total is $96,604.39, which would mean that costs were $13,867 higher than total sales for that year. No one has suggested, however, that ACS Technology took a loss in that year. I find that defendants have not proven that their costs for the relevant time period were other than those shown in Defendants' Ex. W1. W1.

and regulatory approvals after March 28, 2013 to have been willful and deliberate.  The Court

finds on that basis that this qualifies as an exceptional case.

Defendants note that Mr. L'Hotta took down the website and closed ACS Technology

before Mionix filed suit.  The implication is that the lawsuit was unnecessary, and arguably the

small amount of disgorgement tends to indicate the same.  I am not convinced.  Mr. L'Hotta

delayed and delayed, all the while continuing to piggyback on Mionix's proprietary information.

Even though Mr. L'Hotta finally took the website down, it was reasonable in the circumstances

to seek injunctive relief, as the offense was easily capable of repetition.  As for disgorgement,

Mionix argued and apparently believed that it was entitled to $708,856 for its disgorgement

remedy.  Mionix did not know when it filed the lawsuit that the Court's resolution of relevant

facts and legal issues would ultimately reduce the amount of disgorgement to a much smaller

number.  I do not find the pursuit of a lawsuit in the context of a willful and deliberate violation

of the Lanham Act over a period of more than three years to be unreasonable.

**ORDER**

The Court orders that judgment enter in favor of the plaintiffs, Mionix, LLC and Mionix,

Corporation, and against the defendants, Larry L'Hotta, ACS Technology and SAFE-pHix, LLC

as follows:

1.  Plaintiffs' First Claim (Unfair Competition under the Lanham Act) is resolved in

plaintiffs' favor and against the defendants.

2.  Plaintiffs' Second and Fifth Claims (False Designation of Origin and Common Law

Unfair Competition) are either duplicative or moot and are resolved in favor of the defendants.

3. Plaintiffs' Third and Fourth Claims (Trademark and Trade Dress Infringement) are resolved in favor of the defendants.

4. Defendants' counterclaims are resolved in favor of the plaintiffs.

5. Mr. L'Hotta is permanently enjoined from selling any Mionix product without Mionix's permission and from referring to Mionix's products, studies, research, testing, patents, trademarks, trade dress, regulatory approvals or other property in any marketing, labeling or selling of products in the future, whether through his company SAFE-pHix or any other commercial vehicle or enterprise.

6. Mr. L'Hotta, ACS Technology and SAFE-pHix, LLC are ordered, jointly and severally, to disgorge profits and pay the disgorged profits to plaintiffs in the amount of $31,678.65.

7. Plaintiffs are awarded reasonable attorney's fees pursuant to 15 U.S.C. § 1117(a) in an amount to be determined by agreement of the parties or by the Court following an evidentiary hearing.

8. Plaintiffs are awarded their costs pursuant to 15 U.S.C. § 1117(a), Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR. 54.1.

9. 15 U.S.C. § 1117(a) does not expressly provide for prejudgment interest. If plaintiffs believe that there is authority for the awarding of prejudgment interest in this case, and the parties do not agree on the amount of attorney's fees, costs, or interest, they may present their points and authorities to the Court at the hearing on attorney's fees and costs.

10. Post-judgment interest will run on that amount at the federal rate as at the date of judgment pursuant to 28 U.S.C. § 1961.

DATED this 24th day of August, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge